UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
DEREK LIVINGSTON,

                           Petitioner,

              -against-

WILLIAM BROWN, Superintendent,
Eastern Correctional Facility,

                          Respondent.
-------------------------------------------------------X

**REPORT AND
RECOMMENDATION**

07 Civ. 7172 (KMK) (GAY)

TO THE HONORABLE KENNETH M. KARAS, United States District Judge:

       On December 19, 2000, a Westchester County jury convicted petitioner Derek Livingston of one count each of second degree burglary, third degree grand larceny and third degree criminal possession of stolen property.  Petitioner's conviction stemmed from the burglary of Barbara Riker's co-op apartment in the building located at 858 Palmer Road, Bronxville, New York.  The trial court sentenced petitioner as a persistent violent felony offender to sixteen years to life for the burglary conviction, and to concurrent sentences of three and one-half to seven years for each of the remaining counts.[1]  Petitioner is incarcerated at the Eastern Correctional Facility in Napanoch, New York.

       Presently before this Court is petitioner's *pro se* Petition for a Writ of Habeas Corpus ("Petition") pursuant to 28 U.S.C. § 2254.  For the reasons set forth below, I

---

[1] Petitioner's sentences were ordered to run concurrently with a twenty-four month federal sentence imposed for violation of his federal parole upon his conviction for attempted armed bank robbery.

respectfully recommend that the Court deny the petition in its entirety.[2]

## I.  PROCEDURAL HISTORY

Petitioner, by and through counsel, timely appealed the judgment of conviction to the Appellate Division, Second Department, on the grounds that (1) the evidence was insufficient to support petitioner's burglary conviction, (2) petitioner was denied a fair trial because the jury was not instructed on circumstantial evidence, (3) petitioner was denied a fair trial because the trial court precluded petitioner's statement to Detective Jankowski and (4) petitioner's sentence was harsh and excessive.  See Brief for Defendant–Appellant, appended as Exh. 6 to Memorandum of Law and Respondent's Exhibits ("Resp. Mem.").  The Second Department, by Decision and Order dated March 14, 2006, affirmed the judgment of conviction.  See People v. Livingston, 27 A.D.3d 578, 810 N.Y.S.2d 368 (2d Dep't 2006).  The New York Court of Appeals denied petitioner leave to appeal on July 7, 2006.  See People v. Livingston, 7 N.Y.3d 791, 854 N.E.2d 1285, 821 N.Y.S.2d 821 (2006).  On or about July 10, 2007, petitioner timely filed the instant Petition for a Writ of Habeas Corpus, wherein he alleges two grounds for habeas relief: (1) the evidence was legally insufficient; and (2) the trial court's preclusion of petitioner's statement to Detective Jankowski violated petitioner's rights under the Confrontation Clause.

## II.  STANDARD OF REVIEW

"[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.  In conducting habeas review, a federal court is

---

[2] My conclusions are based upon my evaluation of petitioner's claims on their merits, without regard to the issue of exhaustion.  See 28 U.S.C. § 2254(b)(2).

limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 68 (1991). See 28 U.S.C. § 2254(a). Subsequent to the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which amended 28 U.S.C. § 2254, a federal court may not grant habeas relief for any claim adjudicated on the merits in state court unless the petitioner establishes, in pertinent part, that the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). A state court's decision is "contrary to" clearly established Federal law if (1) "the state court arrives at a conclusion opposite to that reached by [the Supreme Court of the United States] on a question of law" or (2) "the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [that reached by the Supreme Court of the United States]." See Williams v. Taylor, 529 U.S. 362, 405 (2000).

As to the "unreasonable application" prong, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." See id. at 411. A state court decision involves an "unreasonable application" of Federal Supreme Court precedent if (1) "the state court identifies the correct legal rule from [Federal Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case" or (2) "the state court either unreasonably extends a legal principle from [Federal Supreme Court] precedent to a new context where it should not apply or unreasonably

3

refuses to extend that principle to a new context where it should apply."  See id. at 407.

## III.  INSUFFICIENT EVIDENCE

Petitioner asserts that he is entitled to habeas relief because his conviction was based on insufficient evidence.  On direct appeal, petitioner argued that the evidence was insufficient to support his conviction for second degree burglary because the evidence did not establish that petitioner "actually entered" the burglarized apartment.[3] The Appellate Division affirmed the conviction and held that the evidence "was legally sufficient to establish the defendant's guilt of burglary in the second degree beyond a reasonable doubt."  See Resp. Mem., Exh. 10.

An insufficient evidence claim is cognizable on habeas corpus review as a violation of due process.  See Jackson v. Virginia, 443 U.S. 307, 321 (1979).  A petitioner who challenges a state criminal conviction under 28 U.S.C.  § 2254 "is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt."  Id. at 324.  Conversely, "[i]f 'any rational trier of fact could have found the essential elements of the crime,' the conviction must stand."  United States v. Badalamenti, 794 F.2d 821 (2d Cir. 1986) (quoting Jackson, 443 U.S. at 319).  Additionally, the record must be reviewed in the light most favorable to the prosecution.  See Maldonado v. Scully, 86 F.3d 32, 35 (2d Cir. 1996).  A petitioner who challenges the sufficiency of the evidence "bears a very heavy burden."  See Fama v. Commissioner of Correctional

---

[3] On direct appeal, petitioner did not argue that the evidence was insufficient to support his convictions for third degree grand larceny and/or third degree criminal possession of stolen property.

4

<u>Servs.</u>, 235 F.3d 804, 813 (2d Cir. 2000).

In reviewing the trial record, a federal habeas court must defer to the jury's assessments as to witness credibility and the weight of the evidence.  <u>See</u> <u>Maldonado</u>, 86 F.3d at 35.  Therefore, it is solely the responsibility of the trier of fact to weigh the evidence, to resolve any conflicts in the testimony, and to draw reasonable inferences. <u>See</u> <u>Jackson</u>, 443 U.S. at 319.  The sufficiency-of-evidence "inquiry does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit."  <u>See</u> <u>Herrera v. Collins</u>, 506 U.S. 390, 402 (1993).

A federal habeas court reviewing an insufficient evidence claim must look to state law to determine the elements of the crime.  <u>See</u> <u>Quartararo v. Hanslmaier</u>, 186 F.3d 91, 97 (2d Cir. 1999) (citation omitted).  Under New York law, a person is guilty of second degree burglary when he knowingly enters or remains unlawfully in a building with the intent to commit a crime therein, and the building is a dwelling.  <u>See</u> New York Pen. L. § 140.25(2).  Here, contrary to petitioner's contentions, the trial testimony was sufficient to establish each element of second degree burglary beyond a reasonable doubt.  The following testimony was elicited by the prosecution at trial:

<u>Barbara Riker</u>:  In October 1999, Ms. Riker lived at 858 Palmer Road, Apartment B, in Bronxville, New York (418).[4]  Her apartment was located in the basement level of a three-floor co-op building (419).  On October 6, 1999, Ms. Riker's apartment was burglarized while she was at work (431-34).  The perpetrator gained access to the

---

[4] Numbers in parenthesis refer to pages from the trial transcript.

apartment via a living room window, which Ms. Riker usually kept locked (434-35, 439).

Ms. Riker determined that the following items were missing from her apartment: an

engraved gold locket; several gold bracelets; assorted costume jewelry; a diamond ring;

pearl earrings; several watches, one of them gold; an engraved pen; $1,800 - $1,900

cash; a Macintosh desk computer, including the keyboard, monitor, modem and cords;

a laptop computer; two black travel bags; and an empty box that she had left in the

middle of the sitting area (436-38).  Yonkers police recovered most of the items and

ultimately returned them to her (441-43).

    Laura Zygmunt:  On October 6, 1999, at approximately 12:30 p.m., Ms. Zygmunt

saw a red Acura, driven by a black man, speed past her toward a dead end, turn around

and come back (471, 476-77).  The Acura was followed closely by another vehicle,

whose driver was yelling that the driver of the Acura had robbed a house (471, 474).

Ms. Zygmunt called the Yonkers Police Department and provided them with the Acura's

license plate number and a description of the car (472).

    Raymond Dugan:  Raymond Dugan was employed as a maintenance supervisor

for the Yonkers Department of Public Works (518-19).  On October 6, 1999, at

approximately 12:30 p.m., Mr. Dugan was driving west toward Barton Road when a red

car sped past him heading west in the eastbound lane (521-22).  Another car pulled up

alongside of Mr. Dugan and the driver, a male, asked Mr. Dugan whether he had a

phone and if he would call the police (523).  The driver stated that his house had just

been robbed by the man in the red car (523).  The driver took off in pursuit of the red

car, which had turned right onto Barton Road toward a dead end (523).  Mr. Dugan

turned onto Barton Road, pulled over, exited his vehicle, called his office and asked

them to call police (523-24).  While he was on the phone, the red car came speeding

back toward him (524).  The red car stopped and its driver, a stocky black male, asked

Mr. Dugan whether he was calling the police (524, 526).  Mr. Dugan replied that he was

not, and the driver of the red car exited his vehicle and approached Mr. Dugan (524-25).

The driver of the red car stated "this guy hit my car and he's chasing me" (525).  As the

other vehicle approached, the driver of the red car got back into his vehicle and took off,

with the second vehicle in pursuit (525).  Mr. Dugan did not notice any damage to the

red car (527).

     <u>Lisa Piarulli</u>:  On October 6, 1999, at 12:44 p.m.,Yonkers Police Officer Lisa

Piarulli was dispatched to investigate a burglary at 858 Palmer Road (535, 537-38).

Officer Piarulli, along with Officers Pornachio and Howell, entered the apartment and

determined that it had been burglarized (540-41, 543).  The Officers notified the owner

and spoke to Mr. William Frey (542, 548).  Detectives Mazzei and Zygmunt arrived, took

photos and checked for fingerprints (549).  At some point, the homeowner (Ms. Riker)

returned (549).  At approximately 12:44 p.m., Officer Piarulli learned that a vehicle was

wanted in connection with the incident (553-54).  She left the scene at approximately

3:12 p.m. and returned to the precinct (551).  As Officer Piarulli prepared her report,

headquarters notified her that they had located the car that was wanted in connection

with the burglary (552-53).  The car had been located in Mount Vernon, and Officer

Piarulli arranged for another officer to transport her to that location (555).

     She arrived at 160 East 4th Street, Mount Vernon, at approximately 4:00 p.m. and

observed a red Acura parked behind an apartment complex (556-57).  The officers

inventoried and impounded the vehicle, and returned to Yonkers police headquarters

(557-66). They were followed by two Mount Vernon detectives, who had arrived at the location of the vehicle during the impound process (565, 567). The Mount Vernon detectives transported several items of personal property, as well as a male by the name of Derek Livingston, to Yonkers headquarters (568-69). The items of personal property, photographed at the Yonkers detective division, included a computer, a ring, a laptop, case and power packs (569-70). Some of the personal items were returned to Ms. Riker that evening (570). Ms. Riker provided serial numbers for the computer equipment (572). Mr. Livingston was booked on charges in connection with the incident (573).

Frank Nappi: Yonkers Police Officer Frank Nappi worked in the communications division and, at the time of the incident, was the tape reproducer for the Yonkers Police Department (657-58). All phone calls coming into and going out of the Yonkers Police Department are tape recorded and time-stamped (658-59). Officer Nappi was asked to locate and copy all communications relevant to the October 6, 1999 Palmer Road incident (660-61). The first call was received at 12:26 p.m. and originated from the Yonkers DPW (663). At 12:35, Yonkers police received a call from an individual who identified herself as Laura Zygmunt (663). Seconds later, a call was received from an individual who identified himself as William Frey (664). At 1:47 p.m., a call was received on an administrative line from [petitioner] Derek Livingston (665-66,70).[5] Mr. Livingston

---

[5] The jury heard the tape recorded phone call, aided by a transcript of said conversation (670-72). Counsel stipulated that it was [petitioner] Derek Livingston's voice on the tape (670). The gist of the phone call is as follows: Mr. Livingston acknowledged that his red Acura was sought by the police; he claimed he had been in Yonkers, coming from the Board of Education, when he saw a man drop a black bag, and another man nearby carrying two similar bags also drop one of his bags, and both

made two additional calls to the station at 3:32 p.m. and 3:34 p.m. (674-76).

Richard Morra:  At all relevant times, Richard Morra was employed as a

Detective with the Mount Vernon Police Department (706).  On October 6, 1999, Mount

Vernon police officer Sean Harris came to Detective Morra's office with a civilian, later

identified as [petitioner] Derek Livingston (706-08).  Detective Morra and his partner,

Detective Gleason, interviewed Mr. Livingston (709).  Mr. Livingston was anxious to

speak to someone about some property about which he had some information (709).

Mr. Livingston stated the following:

Earlier that day, he was near the Yonkers Board of Education and saw a black

male (709).  As they neared each other, the black male dropped a black bag to the

ground (709-10).  Mr. Livingston picked up the bag and then retrieved a box he had

noticed in some hedges nearby (710).  The box contained computer equipment (710).

Mr. Livingston placed the property into the trunk of his car (710).  Mr. Livingston drove

off and was followed by a gold Nissan [A]ltima (710).  He was able to "lose" this vehicle

at some point, and drove into the City of Mount Vernon (710).  Shortly thereafter, Mr.

Livingston called the Yonkers police department about the property, and spoke to a

female who knew nothing of the incident (710).  Mr. Livingston then contacted Mount

Vernon police (710).

Mr. Livingston told Detectives Morra and Gleason that the property was in a

shopping cart on Amsterdam Place (711).  The detectives, with Mr. Livingston, drove to

---

men ran; Mr. Livingston retrieved the dropped bags, along with a box full of computer
equipment, and placed the property in a shopping cart; he agreed to turn over the
property to Yonkers police at an agreed-upon location, but did not appear.  See Resp.
Mem., Exh. 1.

the location and found a shopping cart, within which was a box containing computer equipment (711).  The detectives removed the items from the shopping cart and placed them in their vehicle (712).

On the way back to police headquarters, Mr. Livingston asked whether the officers could check on his vehicle, and they agreed and proceeded to its location on Franklin Avenue (712-13).  When they arrived, they came upon a Yonkers police vehicle and a tow truck (713).  Mr. Livingston immediately asked why his car–a red Acura Legend–was being towed (713).  Detective Gleason exited the vehicle and spoke to the Yonkers officers (714).  Gleason came back and spoke to Morra; Detective Morra told Mr. Livingston that the Yonkers police department was handling the entire incident (involving the property and the towing of the vehicle) and that they would take him to Yonkers so he could sort out the matter (715).  The detectives, with Mr. Livingston, followed a Yonkers police vehicle to Yonkers police headquarters, where Yonkers police officers took Mr. Livingston into custody (715).  The Mount Vernon detectives turned over the property recovered from Amsterdam Place to the Yonkers police officers (716).

William Frey:  In October 1999, William Frey lived in apartment 1-A on the first floor of the building located at 858 Palmer Road (747-48, 750-51).  On October 6, 1999, Mr. Frey left his apartment at approximately 12:15 p.m. (750).  He went into the garage, got into his car, and proceeded to drive it up the driveway (751).  As Mr. Frey proceeded up the incline out of the garage, he noticed a male pedestrian about twenty feet ahead, crossing the driveway on the sidewalk, carrying a box and two shoulder bags (752-53).[6]

---

[6] At trial, Mr. Frey identified the man as [petitioner] Derek Livingston (763).

The man continued walking in an easterly direction as Mr. Frey continued to the top of the driveway (753). Mr. Frey stopped to check traffic, looked to his right, and the man turned around to look at Mr. Frey, causing Mr. Frey to become a little suspicious (753). The man continued walking down a little side street called Brook Street (753). Mr. Frey looked around and noticed that the door of his neighbor's basement apartment was ajar, and one of the windows was open (754). Mr. Frey got out of the car and saw a screen in a little wooded area directly across from the open window (755). After verifying that no one was home, Mr. Frey looked into the apartment and noticed a computer table, but no computer (756). He then left to try and find the man he had observed (756).

Mr. Frey got back into his car–a 1998 Nissan [A]ltima–and drove around the block but did not spot the man (760, 766). He parked his car on Palmer Road right in front of his house, facing east (766-67). Mr. Frey immediately saw a red car coming out of Brook Road (772). At trial, Mr. Frey identified the red car as an Acura Legend (783-84). The red car's window was down and Mr. Frey recognized the driver to be the man Mr. Frey was seeking (772). The red car turned left out of Brook Road, heading west; Mr. Frey made a U-turn and went behind him (772-73). The red car accelerated and "the chase was on" (773). Mr. Frey began blowing his horn, hoping to attract attention so someone would call the police (773). He continued chasing the red car all the way up to Mile Square Road (773). At one point, traffic slowed because of a traffic light and Mr. Frey jotted down the red car's license plate number (773). On Mile Square Road, Mr. Frey recognized a Yonkers city car and (assuming the driver had a phone) yelled out to the driver–a man–"Call the cops. This guy just robbed the apartment, my apartment" (774).

11

The red car made a right turn off of Mile Square Road (774). Mr. Frey knew the red car was headed for a dead end, so he followed the red car only part of the way down to the cul-de-sac (775). The red car then headed back in Mr. Frey's direction, and he had to swerve to the right to get out of the way (775). As the red car passed, Mr. Frey got another look at the driver and verified that he was the same man Mr. Frey had seen crossing the sidewalk (775). Mr. Frey made a U-turn and continued to follow the red car (776). As they passed the park, Mr. Frey yelled out to a couple of women to call the police and that the man had robbed the apartment (776). They came upon the Yonkers city car still in the same place, and the driver of the red car got out of the car for a minute, then got back in (776). Mr. Frey continued to follow the red car as it made its way back to Palmer Road (776-77). The red car made several turns onto various streets and, eventually, Mr. Frey lost sight of him near Saunders High School (777). Mr. Frey continued down Palmer Road but did not see the red car, so he made another U-turn and headed back to his house (778).

When he arrived at the house, Mr. Frey went back into the apartment that had been broken into to look for a phone to call 911 (780). He found an unplugged phone on the floor, plugged it back in, and called the Yonkers police (780). When the police arrived, Mr. Frey was outside waiting for them (780-81). He told the police everything that had occurred (781).

Viewing the above testimony in the light most favorable to the prosecution, and construing in the prosecution's favor all permissible inferences arising from said evidence, a rational jury could have found beyond a reasonable doubt that petitioner was guilty of the crime of second degree burglary. The evidence established the

following: someone entered Barbara Riker's apartment through a window which she usually kept locked;  several items, including cash, jewelry and computer equipment, were taken from her apartment; the testimony of an eyewitness placed petitioner at the scene of the crime, proceeding in a direct line of travel from the unit that had been burglarized, and in exclusive possession of the property stolen from Barbara Riker's apartment; the eyewitness positively identified petitioner.  Moreover, a rational jury had ample reason to reject petitioner's version of events and, in any event, "the assessment of the credibility of witnesses is generally beyond the scope of review."  See Schlup v. Delo, 513 U.S. 298, 330 (1995).  In sum, this Court cannot conclude that the state court's adjudication of petitioner's insufficient evidence claim contravened or unreasonably applied Jackson v. Virginia.  Accordingly, I conclude, and respectfully recommend, that petitioner's insufficient evidence claim is meritless and must be dismissed.

## IV.  PRECLUSION OF PETITIONER'S STATEMENT TO DETECTIVE JANKOWSKI

Petitioner alleges that the trial court's preclusion of his statements to Detective Jankowski violated petitioner's rights under the Confrontation Clause.  Petitioner states that he gave essentially identical statements to the Mount Vernon detectives and to Yonkers Detective Jankowski.  Petitioner argues that, at trial, Detective Morra could not recall portions of petitioner's statement that were "critical" to his defense, to wit, that petitioner had gone to the Yonkers Board of Education on the day in question to inquire about his paycheck and future employment.  Petitioner, therefore, wanted to elicit this information from Detective Jankowski, who was called as a defense witness.  Defense counsel sought to establish that petitioner was cooperative at Yonkers police

13

headquarters and answered all questions posed to him (694-96).  However, when defense counsel attempted to elicit the substance of petitioner's statement at issue, the trial court sustained the prosecution's hearsay objection (855-60).[7]

In the first instance, as the error claimed did not involve petitioner's attempts to cross-examine a prosecution witness but, rather, involved petitioner's attempt to elicit hearsay testimony from a defense witness, the correct constitutional basis for petitioner's instant claim is an alleged violation of his constitutional right to present a complete defense.  Said claim, so stated, was raised on direct appeal; the Second Department dismissed said claim on its merits, without comment.

"The right to call witnesses in order to present a meaningful defense at a criminal trial is a fundamental constitutional right secured by both the Compulsory Process Clause of the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment."  Washington v. Schriver, 255 F.3d 45, 56 (2d Cir. 2001).  See Crane v. Kentucky, 476 U.S. 683, 690 (1986) (criminal defendants have a Constitutional right to "a meaningful opportunity to present a complete defense"); Chambers v. Mississippi, 410 U.S. 284, 302 (1973) ("Few rights are more fundamental than that of an accused to present witnesses in his own defense.").  On the other hand, a defendant "does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence."  See Taylor v. Illinois, 484 U.S. 400, 410 (1988).  "Standard rules of evidence have long prohibited parties from offering

---

[7] The admissibility of the substance of petitioner's statement to Detective Jankowski was argued by the parties several times during trial; each time, the trial court ruled that the statement was inadmissible hearsay (642-45, 692-96, 859-60, 865-66).

hearsay statements, which, precisely because they are made out of court, do not afford the jury the opportunity to assess a declarant's credibility by reference to his demeanor, and do not afford an adversary the opportunity to employ cross-examination to test the truth of the declaration."  Rodriguez v. Artuz, 123 Fed. App'x 428, 429 (2d Cir. 2005) (citing Chambers, 410 U.S. at 298).

Moreover, "[e]rroneous evidentiary rulings rarely rise to the level of harm to this fundamental constitutional right [to present a meaningful defense]."  Washington, 255 F.3d at 56 (quotation and citation omitted).  Rather, erroneous exclusion of testimony warrants habeas relief only if "the excluded testimony was material to the presentation of the defense so as to deprive the defendant of fundamental fairness."  Rosario v. Kuhlman, 839 F.2d 918, 924 (2d Cir. 1988).  More specifically, the Second Circuit has held:

> [W]hether the exclusion of [witnesses'] testimony violated [defendant's] right to present a defense depends upon whether the omitted evidence [evaluated in the context of the entire record] creates a reasonable doubt that did not otherwise exist.  In a close case, "additional evidence of relatively minor importance might be sufficient to create a reasonable doubt."  On habeas review, trial errors are subject to lenient harmless error review.  The creation of otherwise non-existent reasonable doubt satisfies the "substantial and injurious" standard [of Brecht v. Abrahamson, 507 U.S. 619 (1993)].

Washington, 255 F.3d at 56 (quoting Jones v. Stinton, 229 F.3d 112, 120 (2d Cir. 2000)) (alterations in the original) (internal citations omitted).

Here, Detective Morra testified that petitioner, in his statement to the Mount Vernon Detectives, said he was near the Yonkers Board of Education when he came across a black male carrying a black bag (709).  Petitioner sought to introduce evidence of why he was there on the day in question via a statement he gave to Detective

15

Jankowski.  Petitioner presently argues that the trial court's ruling was erroneous because the statements at issue were not offered for their truth but, rather, to "provide context, rebut the faulty memory of Morra, and to describe Petitioner's conduct."  <u>See</u> Affidavit attached to Petition for a Writ of Habeas Corpus, at 8.  Petitioner specifically contends that the statements at issue were crucial to his defense and, therefore, that their preclusion violated his constitutional rights.

        In the first instance, petitioner's reason for his presence at the Yonkers Board of Education is insignificant to his ultimate defense that he found the property, he contacted police and was forthcoming and cooperative with the investigation   More importantly, petitioner in fact presented at trial the defense he now asserts was precluded.  The jury was twice presented with petitioner's "exculpatory" statements during the prosecution's case:  petitioner admits that the statement he gave to Detective Jankowski essentially mirrored the statement he gave to the Mount Vernon detectives; the statement at issue is consistent with petitioner's statements on the 911 tape. Therefore, the exclusion did not violate petitioner's right to present a defense because the omitted evidence does not create a reasonable doubt that did not otherwise exist. In sum, petitioner has not shown that the Appellate Division's decision was either "contrary to, or involved an unreasonable application of, clearly established Federal law[.]"  <u>See</u>  28 U.S.C. § 2254(d)(1).   Accordingly, I conclude, and respectfully recommend, that petitioner's remaining claim for habeas relief is without merit and must be dismissed.

## V.  CONCLUSION

        For the foregoing reasons, I respectfully recommend that the instant petition for a

16

writ of habeas corpus be denied in its entirety.

## VI. NOTICE

Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule 8(b)(3) of the Rules governing § 2254 proceedings, the parties shall have fourteen (14) days from the receipt of this Report to serve and file written objections to this Report and Recommendation.  If copies of this Report are served upon the parties by mail, the parties shall have seventeen (17) days from receipt of this Report to file and serve written objections.  See Rule 11 of the Rules governing § 2254 proceedings;  Fed. R. Civ. P. 6(d).  Such objections, if any, shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of The Honorable Kenneth M. Karas at the United States District Court, Southern District of New York, 300 Quarropas Street, White Plains, New York 10601, and to the chambers of the undersigned at said Courthouse.

Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be entered.  See Caidor v. Onondaga County, 517 F.3d 601, 604 (2d Cir. 2008).

Requests for extensions of time to file objections must be made to the Honorable Kenneth M. Karas and not to the undersigned.

Dated:        November /\6, 2010
              White Plains, New York

                                        Respectfully submitted,

                                        _____
                                        GEORGE A. YANTHIS, U.S.M.J.